# EXHIBIT C

RODRIGUEZ

1    A.    Yes.

2    Q.    Did you notice smoke in your cell, before

3 Defendant Ferraro knocked on the door?

4    A.    Yes.

5    Q.    Did you call for help, when you noticed the smoke

6 in your cell?

7    A.    I don't recall.

8    Q.    Was there a smoke alarm that went off, as a

9 result of the smoke in your cell?

10    A.    No.

11    Q.    What date did this incident occur on?

12    A.    8/31/20.

13    Q.    What day of the week was that?

14    A.    Monday.

15    Q.    And at what time did the incident occur?

16    A.    Approximately -- approximately 1800 hours.

17    Q.    What facility did this incident occur in?

18    A.    Manhattan Detention Center Complex.  Manhattan

19 Detention Complex, 125 White Street.

20    Q.    How long had you been living at M.D.C., prior to

21 this incident occurring?

22    A.    I'm not sure.

23    Q.    Was it more than one month?

24    A.    I'm not sure.

25    Q.    More than one week?

RODRIGUEZ

Page 35

1     A.     Yes.

2     Q.     More than two weeks?

3     A.     I'm not sure when I arrived at Manhattan

4  Detention Complex.

5     Q.     Where were you housed at Manhattan Detention

6  Complex?

7     A.     Housing Unit 9 South.

8     Q.     And what type of housing unit is 9 South?

9     A.     I don't understand the question.

10    Q.     Is Unit 9 South enhanced security housing?

11    A.     I'm not sure what is that?

12           You said -- sorry, can you repeat the question --

13  enhanced what?

14    Q.     Is Unit 9 South enhanced security housing?

15    A.     Yes.

16    Q.     What were you doing when you first noticed that

17  there was smoke in your cell?

18    A.     I was standing by the door, the cell door,

19  waiting for the instructions by the officers.

20    Q.     Were the officers already at the door, when you

21  first noticed the smoke?

22    A.     Yes, all the defendants -- not all of the

23  defendants -- but most of the defendants were at the door,

24  yes.

25    Q.     Did you try to put the fire out, yourself?

RODRIGUEZ

Page 36

1   A.    By the time the defendants arrived, the fire was

2   already out.

3   Q.    So did you put out the fire yourself?

4   A.    Yes.

5   Q.    Okay.  How did you put it out?

6   A.    I threw water on it.

7   Q.    Did you have a radio in your cell at the time of

8   the fire?

9   A.    I do not recall.

10   Q.    Did you have batteries of any kind in your cell,

11   at the time of the fire?

12   A.    I do not recall.

13   Q.    How many officers responded to your cell, as a

14   result of the fire?

15   A.    I would like -- to re-answer the last question

16   that you asked me.

17   Q.    Okay?

18   A.    Can you re-ask me, please.

19            MS. WEALL:   Please read the question back.

20            (Whereupon, the referred to question was

21        read back by the Reporter.)

22            THE WITNESS:   Thank you.

23   A.    I want to re-answer the question.

24        I did not have no [SIC] radio in my cell and I

25   did not have no [SIC] batteries because all of my property

RODRIGUEZ

Page 38

1    Q.     How many other officers were there?

2    A.     Between four and six other officers.

3    Q.     Did you say anything to the officers?

4    A.     What time are you referring to?

5    Q.     When they came to your cell.

6    A.     When they initially came up to my cell?

7    Q.     Yes.

8    A.     Or when they opened up the cell?

9    Q.     When they initially came to your cell; that's

10   what we are talking about now, did you say anything to

11   them?

12   A.     I do not recall if I said anything.

13   Q.     Did the officers say anything to you?

14   A.     No, they said something to each other.

15   Q.     What did they say to each other?

16   A.     Defendant -- Defendant Galuezuskiy told Defendant

17   Ferraro that, we got this, you can leave, we will take care

18   of him.

19   Q.     Did they say anything else to each other?

20   A.     I do not recall.

21   Q.     All right.  Now, did the officers open the door

22   to your cell at any time?

23   A.     Yes.

24   Q.     When the officers opened the door to your cell,

25   did you say anything to the officers?

RODRIGUEZ

Page 39

1       A.      Yes, I pleaded with Defendant Galuezuskiy to stop

2   spraying me in the face with the fire extinguisher.

3       Q.      We are talking about when the door initially

4   opened, did you say anything to the officers?

5       A.      No.  But when the door initially opened,

6   Defendant Galuzevskiy was spraying the fire extinguisher

7   inside, when the fire was already out.

8               And what I stated to -- when the door opened,

9   while he was spraying me in the face with the fire

10  extinguisher, I pleaded with him to stop spraying me in the

11  face with the fire extinguisher.

12              There was no fire.  There still was no fire in

13  the cell.

14      Q.      Was there still smoke in cell at that time?

15      A.      Yes.

16      Q.      Did the officers give you any orders?

17      A.      Nope.

18      Q.      Did the officers say anything to you?

19      A.      Nope they told -- Defendant Galuezuskiy and

20  Defendant Williams -- Defendant Galuezuskiy told Defendant

21  Williams to, get me; like, get him, get him.

22      Q.      Did you approach any of the officers, when they

23  came to your cell?

24      A.      I had my hands directly in the air, in surrender

25  mode, with both of my palms facing them, and I started to

RODRIGUEZ

1    walk towards them, to get out of the smoke -- to get away

2    from the smoke-filled cell.

3        Q.    So if the cell was smoke filled, how would the

4    officers have known that the fire was out?

5        A.    The cell was -- had smoke inside of it, but it

6    wasn't smoke filled to the point where I wasn't visible.

7        Q.    But there was still smoke in the cell; is that

8    correct?

9        A.    A little bit -- yeah, the smoke filled the cell,

10   but not black smoke where you could not visibly see in the

11   cell.  You could see perfectly fine into the cell.

12       Q.    Did you threaten the officers, when they came

13   into your cell?

14       A.    No.

15       Q.    Did you threaten other inmates, when the officers

16   came into your cell?

17       A.    No.

18       Q.    Did any of the officers attempt to put out the

19   fire?

20       A.    There wasn't a fire to put out.

21       Q.    But you said one of the officers was using a fire

22   extinguisher; is that correct?

23       A.    Yes, as a weapon.

24       Q.    What were the other officers doing, when the

25   officer was using the fire extinguisher?

RODRIGUEZ

Page 41

```
 1      A.      The other officers were standing around, not

 2   doing anything, while Defendant Galuezuskiy was spraying me

 3   in my face with the fire extinguisher.

 4              I put my hands up in the air, I started to walk

 5   towards the door, and that's when Defendant Williams, along

 6   with another officer, both sprayed me with OC.

 7      Q.      At this time, did any of the officers give you

 8   orders?

 9      A.      No.

10      Q.      Did they tell you to stop moving towards them?

11      A.      No.

12      Q.      Were you ordered to leave your cell?

13      A.      No.

14      Q.      Was the fire extinguisher water based or chemical

15   based?

16      A.      Sorry, I don't understand the question.

17      Q.      Well, there are different types of fire

18   extinguishers; some use water, some use chemicals, which

19   type of fire extinguisher was this?

20      A.      Water.

21      Q.      And which of the officers sprayed you with pepper

22   spray?

23      A.      Two officers spayed me at the same time,

24   including Defendant Williams.

25      Q.      Had you refused to obey an order, prior to being
```

RODRIGUEZ

Page 42

1   sprayed with pepper spray?

2        A.    No.

3        Q.    Had you threatened --

4        A.    Sorry, there were not any orders given to me.

5        Q.    All right.  Had you threatened an officer prior

6   to being sprayed with the OC spray?

7        A.    No.

8        Q.    Had you refused to leave your cell?

9        A.    No.

10       Q.    Had you interfered with the officers putting out

11  the fire in your cell?

12       A.    There was no fire in the cell.

13       Q.    Had you interfered with the officers

14  investigating whether there was a fire in your cell?

15       A.    No.

16       Q.    Were you eventually handcuffed?

17       A.    I was handcuffed -- I was rear cuffed, which I

18  was not supposed to be, and, yes, I was rear cuffed, yes,

19  after getting -- after the defendants released excessive

20  force on me.

21       Q.    Where were you, when you were handcuffed?

22       A.    I was inside the cell.

23       Q.    Had you resisted being handcuffed, prior to being

24  sprayed with pepper spray?

25       A.    No.

RODRIGUEZ

Page 43

1     Q.      What was your demeanor when the officers

2   attempted to handcuff you?

3     A.      Compliant.

4     Q.      Which officer handcuffed you?

5     A.      Defendant Galuezuskiy.

6     Q.      Did you ever tell Officer Galuezuskiy that you

7   were not supposed to be rear cuffed?

8     A.      The Department of Corrections was provided and

9   the E.S.U. team requested a contraindications; basically

10  asking what type of cuffing procedures are allowed.

11          They requested that from medical and they were

12  provided of that.  But it's not my job to basically tell

13  the officer what to do.

14          But they definitely -- the Department of

15  Corrections and the E.S.U., who basically was [SIC] all the

16  people who responded, all the defendants who responded,

17  were provided with contraindications to rear cuffing me

18  prior to this incident.

19    Q.      It's your testimony you did not personally tell

20  the officer that you were not supposed to be rear cuffed;

21  is that correct?

22    A.      Repeat the question, please.

23    Q.      It is your testimony, you did not personally tell

24  the officer that you were not supposed to be rear cuffed;

25  is that correct?

RODRIGUEZ

Page 44

1     A.     I do not recall if I told him that or not.

2     Q.     Were you eventually removed from your cell?

3     A.     Yes.

4     Q.     Were you taken somewhere else, after you were

5  removed from your cell?

6     A.     Yes.

7     Q.     Where were you taken?

8     A.     I was taken to an area outside of the housing

9  area, and left on the wall to burn.

10     Q.     Who took you outside of your cell, to the wall?

11     A.     The defendants in question.

12     Q.     Which one of the defendants?

13     A.     I believe it was Defendant Galuezuskiy.

14     Q.     So there was only one officer; is that correct?

15     A.     No, there were multiple officers.

16     Q.     All right.  Who were the other officers?

17     A.     Defendant Williams, Defendant Moise, among other

18  officers who were in the area.

19     Q.     Did they say anything to you, when they were

20  moving you from your cell to that area near the wall?

21     A.     You are asking me if I said anything to them?

22  Or them to me?

23     Q.     No.  Did they say anything to you?

24     A.     In that particular area?

25     Q.     While they were moving you from your cell to the

RODRIGUEZ

Page 45

1    area near the wall that you described, did they say

2    anything to you?

3        A.    I don't recall.

4        Q.    Did you say anything to them?

5        A.    Yes.

6        Q.    What did you say?

7        A.    I asked them, when will I be decontaminated?

8              And, in response to that, I was told to, shut up,

9    and they tightened the cuffs more.

10       Q.    Did you request any medical treatment at any

11   point?

12       A.    While I was escorted to the decontamination pen,

13   I was threatened by the officers, I'm not sure which

14   officer it was, or if it was one of the defendants, but it

15   had to be an officer, because there's nobody else escorting

16   me but the officers as well as the defendants, and I was

17   told to deny medical, or else.

18       Q.    Did you ever request medical attention?

19       A.    Yes, I requested medical attention while I was

20   decontaminating.  And I was -- Defendant Gibson was in

21   charge of providing me medical attention, she did not

22   provide me medical attention for over five hours.  I was

23   left in the decontamination shower for over five hours.

24             And, because of it, the investigation, they gave

25   a facility referral.  Because I was supposed to be provided

RODRIGUEZ

Page 46

1   medication attention quicker.

2       Q.      When you say Defendant Gibson was responsible for

3   giving you medical attention, is she a medical

4   professional?

5       A.      She is responsible for providing medical

6   attention.

7       Q.      What do you mean by that?

8       A.      She was the area supervisor; so the area

9   supervisor is in charge if there's an injury, the area

10  supervisor is in charge and basically responsible for

11  providing adequate medical care.

12      Q.      But when you say, providing medical care, it

13  sounds like you were referring to a doctor or a nurse; was

14  this officer responsible for actually tending to your

15  physical injuries?

16      A.      The officer -- sorry, the captain, captain --

17  Defendant Gibson, was in charge of making sure that I am

18  provided medical care; that's her responsibility.

19      Q.      Were you taken to the clinic?

20      A.      I was taken to the clinic, after more than five

21  hours.

22      Q.      And what were your specific medical complaints?

23      A.      I was told by Defendant Gibson, that if I -- if I

24  deny [SIC] -- if I denied [SIC] medical care, I would be

25  provided my property back.

RODRIGUEZ

Page 47

1          And she reminded me of -- no, no -- sorry -- she

2   said that if I don't deny medical care, I would not be

3   given my property back.

4          And after the threats from the other defendants

5   earlier, when they brung [SIC] me to the -- to the

6   decontamination pen, when they stated that -- deny medical,

7   or else, I basically went to clinic, and I never saw the

8   doctor, I never signed any refusal form.  Defendant Gibson

9   went up to the doctor and told the doctor that I'm okay.

10     Q.     Did you verbally refuse medical care at any

11  point?

12     A.     Yes, I told the doctor that I was okay.

13     Q.     Okay.

14     A.     I never -- I never refused medical; all I told

15  the doctor was, that I was okay.  He never asked me if I

16  wanted to be provided medical attention.

17         And, basically, Defendant Gibson coached him into

18  how to fill out the forms or whatever process they must do.

19     Q.     Which officer escorted you to the clinic?

20     A.     I was escorted by Defendant Gibson.

21     Q.     And did Captain Gibson stay with you while you

22  were being treated?

23     A.     Like I stated, I was never treated nor did I sign

24  any --

25     Q.     Did she stay with you while you were at the

RODRIGUEZ

Page 48

1    clinic?

2        A.      Yes.

3        Q.      Okay.

4        A.      I wasn't in the clinic very long.

5                I was in the clinic for about 30 seconds.

6        Q.      Was this the first time a fire had ever broken

7    out in your cell?

8        A.      I do not recall.

9        Q.      How many times in total has a fire broken out in

10   your cell?

11       A.      I don't remember.

12       Q.      More than once?

13       A.      I don't remember.

14       Q.      In the 24 hours before the fire, did you consume

15   any alcohol?

16       A.      Sorry?  Can you rephrase the question and be

17   specific, please.

18       Q.      It's a very specific question.

19               In the 24 hours before the fire in your cell, on

20   the date of this incident, did you drink any alcohol?

21       A.      I do not recall.

22       Q.      Did you take any drugs, in the 24 hours before

23   the fire?

24       A.      I do not recall.

25       Q.      As of August 31, 2020, were you taking any

RODRIGUEZ

Page 49

1  medications that affected your memory?

2     A.     I don't remember if I was on my medications.

3     Q.     As of August 31, 2020, did you have any kind of

4  condition that affected your memory?

5     A.     Can you rephrase the question.

6     Q.     As of August 31, 2020, did you have any kind of

7  illness that affected your memory?

8     A.     I do not recall.

9     Q.     Where were you taken, after you were taken to the

10  clinic?

11     A.     I was escorted by Defendant Gibson to the same

12  exact cell that I was in which was still -- had smoke

13  remnants in it, OC spray all over, and I was never -- the

14  cell was never cleaned or decontaminated.

15            And I was basically given my property as a gift

16  for not -- I guess not being able to be provided medical.

17            I was never given any cleaning supplies to clean

18  up the cell or the walls or anything, and it was still

19  filled with smoke.

20     Q.     Did you have any injuries as a result of the

21  events that you have just described?

22     A.     Can you be specific on what type of injuries are

23  you referring to?

24     Q.     Any injuries.

25     A.     I had multiple injuries.

RODRIGUEZ

Page 50

1    Q.    Could you tell us what those injuries were.

2    A.    I had complications and agitation of my diagnosed

3    asthma condition.  I had numbness of my wrists.  And pain

4    in my body.  Shoulder pain as well.  I had pain in my eyes.

5    I had reduced vision, as well as fuzzy vision.  Nightmares.

6    Anxiety.  Depression.  Insomnia.  PTSD.

7    Q.    For how long did the problems with your vision

8    last?

9    A.    Still to this day.  And because of that incident,

10   I was prescribed -- I was prescribed corrective lenses.

11   Q.    Had you been prescribed corrective lenses, before

12   this incident?

13   A.    No.

14   Q.    Were any of the injuries that you have discussed,

15   visible injuries?

16   A.    Yes.

17   Q.    What were those injuries?

18   A.    I had a lot of scratches on my wrists.

19         I had redness from them utilizing excessive OC

20   spray.  My eyes were really red.  I [SIC] could be seen

21   that I was -- experiencing depression and anxiety and

22   stress.

23   Q.    Is this the only time that OC spray was used on

24   you when you were in Department of Corrections custody?

25   A.    No.

RODRIGUEZ

Page 55

1    Q.    Have any of these injuries gotten better?

2    A.    No, they have not.

3    Q.    Have they gotten worse?

4    A.    Yes.

5    Q.    I would like to turn your attention to the second

6    incident that forms the basis of the lawsuit; that's the

7    date you claim Officer Galuezuskiy first approached your

8    cell.

9          MS. WEALL:  And just for the court reporter,

10         that name is Galuzevskiy, spelled,

11         G-A-L-U-Z-E-V-S-K-I-Y.

12   Q.    Now, you claim Officer Galuezuskiy approached

13   your cell on several different occasions.

14         What date did he first approach your cell?

15   A.    I was approached by Defendant Galuzevskiy on

16   December 4, 2020 between the hours of 4:45 p.m. and 5:30

17   p.m.  And he came to my cage area, asked me if I was suing

18   him; I told him, no, out of fear of retaliation.

19   Q.    All right.  Now, where did this incident occur;

20   in what facility?

21   A.    Manhattan Detention Complex and -- in housing

22   area 9 South.

23   Q.    How long had you been living at Manhattan

24   Detention Complex, prior to this incident occurring?

25   A.    Maybe a little before the date of incident.

RODRIGUEZ

Page 56

1    Q.    By, a little before, you mean, one week?

2    A.    I can't say; I'm not sure.

3    Q.    And what exactly did Officer Galuzevskiy say to

4 you?

5    A.    When?  When are you asking me what he said?

6    Q.    On this date we're talking about now, December

7 4th.

8    A.    He asked me if I was suing him.

9    Q.    And did he say anything else?

10    A.    No, no.  He -- didn't say anything else; to the

11 best of my knowledge.

12    Q.    Did you say anything to him at that time?

13    A.    I told him, no; out of fear of retaliation.

14    Q.    And how do you know it was Officer Galuzevskiy

15 that approached you?

16    A.    Because his badge number said 8957.

17    Q.    Can you describe the officer to us.

18    A.    White male, six feet tall -- between six feet,

19 six-one.  Basically -- possibly Eastern European descent;

20 that's basically the best description, but his badge number

21 said 8957.

22    Q.    Who else was in the area when Officer Galuzevskiy

23 approached you?

24    A.    I don't recall.

25    Q.    All right.  Were there other people in the area,

RODRIGUEZ

Page 57

1    when Officer Galuzevskiy approached you?

2        A.    I do not recall.

3        Q.    What were you doing at the time Officer

4    Galuzevskiy approached you?

5        A.    I was out -- standing outside -- I was standing

6    in the cage area, I guess just awaiting a service or

7    whatever.

8        Q.    When did you file your initial complaint in this

9    action?

10       A.    Repeat the question, please.

11       Q.    When did you file your initial complaint in this

12   action?

13       A.    I filed the complaint -- or the complaint was

14   filed by the court on November 20, 2020.

15       Q.    And in that first complaint, did you name Officer

16   Galuzevskiy by name?

17       A.    No.

18       Q.    Why not?

19       A.    I did not name him by name because all I had was

20   his badge number.  I did not know his name.

21       Q.    Did you know him by badge number, in that initial

22   complaint?

23       A.    No.

24       Q.    Why not?

25       A.    Because I wanted to make sure I had the proper

RODRIGUEZ

Page 60

```
1           You mentioned a couple of times that the officers

2    used excessive force on you; what is the excessive force

3    that you claim the officers used?

4       A.      Basically, they utilized OC spray when I -- not

5    at all did I ever threaten them or threaten to use harm

6    against them or try to use harm against them or tried to

7    attack them in whatever manner.

8           They basically utilized excessive force because

9    there was no need to use force at all.

10          And, basically, it was excessive force because

11   Defendant Galuzevskiy sprayed me in my face with the fire

12   extinguisher, all while two other officers sprayed me with

13   OC spray, knowing that they were given and they requested

14   and were given contraindication from correctional health

15   services, stating that they cannot -- that OC spray is not

16   permissible to use against me because of my -- diagnosed

17   conditions.

18      Q.      Is there any other excessive force that you are

19   claiming happened on that day?

20      A.      Can you repeat the question, again.

21      Q.      Do you claim that any other excessive force was

22   used against you on that day?

23      A.      Other than that, and them -- other than that and

24   the defendants basically tightening the cuffs

25   unnecessarily, no.
```

RODRIGUEZ

Page 61

1      Q.     Okay.  So I want to go back now to the incident

2  in your second amended complaint where you allege that

3  Officer Galuzevskiy approached you.

4              We have already discussed the incident on

5  December 4th.

6              In your second amended complaint you allege that

7  Officer Galuzevskiy approached you two more times; is that

8  correct?

9      A.     That is correct.

10     Q.     When was the second time that Officer Galuzevskiy

11  approached you?

12     A.     The second time Defendant Galuzevskiy approached

13  me was on December 15th, 2020, around, I believe, 7:00 p.m.

14              I was in the shower at the time.  He approached

15  me.  He basically told me that if I don't drop the lawsuit,

16  I will be deadlocked or kept locked in my cell, and like

17  basically not going to be fed or -- (indicating) -- like I

18  have to stay in the cell and not come out.

19     Q.     All right.  And at that time, had you named

20  Officer Galuzevskiy in a lawsuit?

21     A.     Can you repeat the question.

22     Q.     Okay.  At the time of December 15, 2020, the

23  second incident where Officer Galuzevskiy allegedly

24  approached you, at that time, had you sued him in a

25  complaint in a lawsuit?

RODRIGUEZ

Page 62

1    A.     Have I ever sued him in a complaint in the

2    lawsuit?

3    Q.     At the time of this incident as of December 15,

4    2020, had you named him in your complaint?

5    A.     No, but I knew his badge number, and I knew what

6    he looked like.

7    Q.     But you had not named him in a complaint either

8    by name or by badge number?

9    A.     I did not name him in the complaint by name or

10   badge number, but I knew who he was, and I had an

11   infraction that was given to me which he was named in.

12   Q.     And what were the circumstances of that

13   infraction?

14   A.     It was -- sorry -- you said, what were the

15   circumstances?  Why was it written?

16   Q.     Of the infraction?

17   A.     Yes, explain what you mean, what were the

18   circumstances?

19   Q.     What caused the infraction to be written?

20   A.     Allegedly they stated that I did not follow

21   direct orders, and that I did a fire.

22         But the infraction was -- thrown away for Due

23   Process Violation, and, upon review of the video footage,

24   the adjudication captain basically dismissed all the

25   charges.

RODRIGUEZ

Page 63

1    Q.    When was that infraction issued?

2    A.    I do not recall.

3    Q.    Did that infraction pertain to the original

4    incident that we discussed with the fire in your cell?

5    A.    Sorry, I think I will answer the question,

6    basically, the infraction question.

7        I have it right here.  (Indicating.)

8        The infraction, I'm reviewing it right now --

9    what's the question -- can you repeat the question for the

10   infraction, please.

11   Q.    That infraction, when it was issued?

12   A.    I don't know when the infraction was issued.

13       I know that the disposition date -- I mean, the

14   date and time of the hearing was on 9/6/20.

15   Q.    Okay.

16   A.    Yes, 9/6/20, 9/8/20 -- sorry -- it's scribbled

17   over here -- let me look.  Oh, sorry, yes, 9/16.

18       It's two different dates on this paper, but --

19   the disposition was given to me on 9/15/20.  That's when

20   the adjudication captain rendered her decision.

21       But the hearing was on 9 -- either 9/6 or 9/8/20;

22   so that's when I was able to review the video footage as

23   well as the officers who were involved by the adjudication

24   captain named Captain Philips.

25       The basis of her finding was DPV and --

RODRIGUEZ

Page 64

1  basically, Due Process Violation.  Her thing was that it

2  was late.

3      Q.      What did that infraction relate to, what

4  incident?

5      A.      The incident of -- that's mentioned in this

6  complaint.

7      Q.      So it did relate to the first incident that we

8  discussed today?

9      A.      Yes.  The imaginary fire incident -- alleged fire

10  incident.

11      Q.      The one that caused the real smoke in your cell.

12      A.      (No response.)

13      Q.      Now, on December 15, 2020, when Officer

14  Galuzevskiy approached you in the shower, who else was in

15  the area?

16      A.      There were other officers in the area; I do not

17  know their name.

18      Q.      Were there other inmates in the area?

19      A.      There were other inmates in the housing area;

20  but, in that particular area, no, not that I'm aware of.

21      Q.      Now, you said that Officer Galuzevskiy asked if

22  you were suing him.  What else did he say to you?

23      A.      Did I answer that question already?

24      Q.      I want to know exactly what he said to you; if

25  there was anything else that he said to you.

RODRIGUEZ

Page 65

1      A.     Anything else, other than what I stated in the

2  prior time you asked me the same question?

3      Q.     Yes.  It's not the same question.

4             I'm asking you to follow up and give me

5  additional information; if there is any.

6             Did he say anything else to you?

7      A.     He stated that if I didn't drop the lawsuit, that

8  I will be deadlocked in my cell.

9      Q.     And what does it mean to be deadlocked in your

10  cell?

11      A.     Keep locked.  Basically staying in the cell, not

12  able to leave and go to no services.

13             Would you like for me to answer the date the

14  infraction was written because I have the infraction right

15  here?

16      Q.     What was the date the infraction was written?

17      A.     The infraction was written on 8/31/20.

18      Q.     Okay.

19      A.     And it was issued to me on 9/3/2020.

20             And he said that, Officer -- Defendant Ferraro

21  was the reporting official that wrote the infraction.

22             And he stated that approximately at 1800 hours,

23  he observed a flickering light, and it appeared to have

24  been flames.  He went to retrieve a fire extinguisher and

25  began to put out the fire from the food slot.

RODRIGUEZ

Page 66

1          At this time, Defendant Moise instructed the

2     rider to relinquish the fire extinguisher to Galuezuskiy,

3     who continued to put out the fire.

4          Once Inmate Rodriguez cell was open, while

5     officer continued to extinguish the fire, Inmate Rodriguez

6     advanced towards E.S.U. which in turn caused Officer

7     Williams to utilize a one, two second burst of chemical

8     agent to the inmate's facial area.  The chemical agent took

9     a desired effect.

10          The inmate placed his hands behind his back,

11     complied with E.S.U. staff, ordered to exit the housing

12     area, and later escorted to the housing intake to

13     decontamination process without further incident.

14     Q.     Thank you.

15     A.     Basically what the adjudication captain wrote on

16     this is --

17     Q.     That's not important.

18     A.     -- how the fire was started.

19     Q.     That's not important.

20     A.     Sorry?

21     Q.     That's not important.

22          All I asked for is the date of the infraction.

23     A.     Okay.  No problem.

24     Q.     You are not responding to my question.

25          Getting back to the 15th of December.

RODRIGUEZ

Page 67

1          When Officer Galuzevskiy said you would be

2     deadlocked in your cell, what did you say to him?

3          A.     I didn't say anything.

4          Q.     And you allege that Officer Galuzevskiy

5     approached you a third time; isn't that correct?

6          A.     That is correct.

7          Q.     When was the third time that he allegedly

8     approached you?

9          A.     The third time he approached me was on --

10    December 18th, 2020 between 6:40 and 6:50.

11         Q.     And where did he allegedly approach you on that

12    date?

13         A.     He approached the cage that I was in.

14         Q.     Who else was in the area when Officer Galuzevskiy

15    approached you?

16         A.     Officers, inmates.

17         Q.     Which officers were there?

18         A.     I don't recall.

19         Q.     Which inmates were in there?

20         A.     Whatever other inmates were housed in the housing

21    area?

22         Q.     How many other inmates were there?

23         A.     I don't know how many other inmates were housed

24    in the area; it could have been between 10 and 15 other

25    inmates housed in that same housing area?

RODRIGUEZ

Page 68

1    Q.    Who was close by, when Officer Galuzevskiy

2    approached you?

3    A.    Sorry?  Who?  Like as an officer?  As an inmate?

4    Q.    First, officers, then, inmates; let's do it that

5    way.

6    A.    I don't know the names of the officers that --

7    who were around him.  And I don't know the name of the

8    inmate that was next door to me.

9          Usually inmates don't go by names, they go by

10   nicknames, so I don't know his real name, so --

11   Q.    What was his nickname?

12   A.    Rory.

13   Q.    What were you doing at the time Officer

14   Galuzevskiy allegedly approached you?

15   A.    I was having a conversation with the other inmate

16   mentioned.

17   Q.    And did he say anything to you, Officer

18   Galuzevskiy?

19   A.    He came towards the cell cage area and he was

20   pointing and he basically like -- was pointing towards the

21   cell; he was like, while I'm here, you stay in your cell.

22   Q.    Did he say anything else?

23   A.    To the best of my knowledge, I'm not sure what

24   else he said; but I know he definitely pointed at my cell,

25   he said, while I'm here, you stay in your cell.

RODRIGUEZ

Page 69

1      Q.      Did you say anything to Officer Galuzevskiy?

2      A.      No.

3      Q.      Now, at some point you amended your complaint in

4  this case for the first time; is that correct?

5      A.      Yes.

6      Q.      Did you name Officer Galuzevskiy by name in that

7  first amended complaint?

8      A.      Yes.

9      Q.      And did you include the information about the

10  three incidents we just talked about in the first amended

11  complaint?

12      A.      Can you repeat the question.

13      Q.      Did you include the information about the three

14  incidents we just talked about in your first amended

15  complaint?

16      A.      Yes.

17      Q.      And when was that complaint filed?

18      A.      What complaint was filed on 2/9/21.

19              Docket No. 30.

20      Q.      All right.  And isn't it true that there was a

21  previous amended complaint, before that second amended

22  complaint was filed in February?

23      A.      Sorry, repeat the question?

24      Q.      The complaint you just mentioned, the one filed

25  in February 2021, that was the second amended complaint.

RODRIGUEZ

Page 73

1    Q.    Were there other inmates there?

2    A.    I don't remember how many inmates were there, but

3    there were other inmates in the housing area.

4          I wasn't the only inmate in that housing area.

5    Q.    Were there any in close proximity to your cell?

6    A.    I don't recall.

7    Q.    Did you amend your complaint to include this

8    incident?

9    A.    No.

10   Q.    Why not?

11   A.    Because I didn't.

12   Q.    Did you file grievances concerning this incident?

13   A.    With the court.

14   Q.    With Department of Corrections, did you file any

15   grievances?

16   A.    I don't recall.  I don't remember if I did.

17         It's possible?

18   Q.    What damages are you claiming in this case?

19   A.    Can you repeat the question.

20   Q.    What damages are you claiming in this case?

21   A.    Sorry?  I object.

22         It's repetition.

23         It's been asked and answered already.

24   Q.    It has not.

25         I'm asking what you say your damages are?

RODRIGUEZ

Page 74

1    A.    What damages are you referring to?

2          Physical damages?  Emotional damages?

3    Q.    Physical, emotion, financial; anything that you

4    are claiming.

5    A.    Basically I suffer physical and emotional

6    damages; like agitation of my asthma condition, numbness,

7    pain in the wrists, pain in the eyes, fuzzy vision, reduced

8    vision, nightmares, anxiety, depression, insomnia, Post

9    Traumatic Stress.

10   Q.    Have you sought medical treatment for the

11   aggravation of your asthma, as a result of this incident?

12   A.    Yes, multiple times.

13   Q.    Have you spent any money on attorneys' fees, as a

14   result of the incidents we have discussed today?

15   A.    Only fees in regard to mailing out particular

16   documents.

17   Q.    So have you spent any money on attorneys' fees,

18   as a result of these incidents?

19   A.    Sorry, can you rephrase the question.

20   Q.    Have you paid for a lawyer, as a result of any of

21   the incidents we have discussed today?

22   A.    Are you referring to just this complaint?

23         Or are you referring to any?

24   Q.    Just this complaint.  Just this complaint.

25   A.    No.

RODRIGUEZ

Page 75

1    Q.    Okay.

2    A.    No, I have not spent my money on any attorneys.

3    Q.    All right.  And when you spoke about the money

4    that you spent on mailing things out, are you referring to

5    postage?

6    A.    Yes.

7    Q.    Did you have any surgery for any of your injuries

8    that you allege happened as a result of the incidents we

9    talked about today?

10   A.    No.

11   Q.    All right.  And you said that a doctor told you

12   that you needed physical therapy as a result of one of the

13   injuries; is that correct?

14   A.    I received physical therapy because of the

15   injuries I sustained.

16   Q.    So does that mean that a doctor did not tell you

17   that you needed physical therapy?

18   A.    He did tell me and he put in a -- they basically

19   -- he put in a medical report so that I can -- he put in a

20   referral to get me physical therapy for the damages that I

21   sustained.

22   Q.    How many physical therapy sessions did you have?

23   A.    Two or more.

24   Q.    More than ten?

25   A.    Less than ten.